T.C. Memo. 2010-31

UNITED STATES TAX COURT

LISA R. AND DARREN T. COLE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

SCOTT C. AND JENNIFER A. COLE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16991-08, 17275-08.  Filed February 22, 2010.

<u>Darren T. Cole</u> and <u>Scott C. Cole</u>, for petitioners.

<u>Stewart Todd Hittinger</u> and <u>Timothy Lohrstorfer</u>, for

respondent.

MEMORANDUM OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies in

petitioners'[1] Federal income taxes and fraud penalties under

_____

[1]These cases have been consolidated for purposes of trial,
                                          (continued...)

section 6663[2] for 2001.  Specifically, respondent determined a $102,227 deficiency and a $76,670 section 6663 fraud penalty against Darren and Lisa Cole for 2001.[3]  Respondent also determined a $556,187 deficiency and a $417,140 section 6663 fraud penalty against Scott and Jennifer Cole for 2001.

There are two primary issues for decision.  The first issue is whether petitioners understated their income in the amounts respondent determined for 2001 as adjusted.  We hold that they did.  The second issue is whether petitioners are liable for the fraud penalty for 2001.  We hold that they are.  Because we find fraud, respondent is not time barred from assessing petitioners' taxes for 2001.

### Background

Lisa and Darren Cole resided in California at the time they filed their petition.  Jennifer and Scott Cole resided in Indiana at the time they filed their petition.

---

[1](...continued)
briefing, and opinion.

[2]All section references are to the Internal Revenue Code in effect for 2001, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[3]Respondent issued petitioners "whipsaw" deficiency notices because of the inconsistent positions petitioners took.  The amounts provided, however, are the amounts respondent ultimately determined are due rather than the amounts set forth in the deficiency notices.

The Bentley Group

Petitioners Scott C. Cole (Scott) and Darren T. Cole (Darren) are brothers. Scott and Darren are attorneys who practiced law in Indiana through an entity known as the Bentley Group during 2001. Bentley was the maiden name of Darren's wife, Lisa Cole (Lisa). The brothers formed the Bentley Group in 1998 and also did business under the name Cole Law Offices. The Bentley Group and Cole Law Offices were different names for the same business, but there were no assumed name filings for either entity.

The law practice was a family affair, with Scott, Darren, and Lisa all taking an active part in the business. Scott's legal practice focused in part on business planning and taxation. Scott created limited liability companies (LLCs) for his clients, prepared corporate and individual tax returns, and represented clients before the Internal Revenue Service (IRS). Scott and Darren also performed criminal defense work, including work for the public defender's office in Boone County, Indiana. Darren, a graduate of Creighton University School of Law, was responsible for the management of the law practice. Lisa, a college graduate, acted as a paralegal.

Darren opened a business checking account for Cole Law Offices but used the Bentley Group's employer identification number. Scott, Darren, and Lisa all had signature authority over

this account.  The brothers agreed to share equally the law practice's profits and losses, though petitioners failed to present any documentation regarding this sharing arrangement. Darren and Scott also agreed that they could withdraw money from the Bentley Group's account.  Any money withdrawn from the account other than money they earned for their legal services was considered "borrowed."  Petitioners failed to report any money they withdrew, however, as income for providing legal services and they also failed to provide any loan documents, notes, or any other investment account records evidencing loan transactions between Scott, Darren, and the Bentley Group's account.

Scott and Darren advised their individual clients, and they also advised clients together.  These joint clients were the law practice's clients.  Clients made payments either directly to the respective brother, through the Bentley Group, or to Cole Law Offices.  Scott also received payment from a client with a check made payable to Scott C. Cole and Associates even though there was no such entity.  The brothers did not keep records, nor did they produce or maintain invoices for their services.  They also failed to keep records or invoices for Lisa's paralegal services.

The taxable deposits in the Bentley Group's account for 2001 totaled $1,430,802.  The earnings came from many sources involving the efforts of both brothers and Lisa.  The Bentley Group received most of its legal fees from Constance J. Gestner

and Terri L. Haynes, co-trustees of the George Sandefur Living Trust (Sandefur Trust), which paid Scott $1.2 million in 2001 to represent the trust in all estate matters. The Sandefur Trust paid the fees in four installments of $300,000. The first check was payable to "Scott Cole and Associates," a fictional business, and the remaining checks were made payable to "Cole Law Offices."

Scott, Darren, and Lisa withdrew in excess of $1 million from the Bentley Group's account during 2001. They then transferred the funds into numerous other accounts with no business explanation for doing so. The brothers were unclear as to which account they used for Interest on Lawyer Trust Accounts (IOLTA) purposes. No records were kept for any of the transfers from the Bentley Group's account. The withdrawals made by or on behalf of Darren or Lisa totaled $198,308, while the withdrawals made by or on behalf of Scott included $1,173,263 in 2001.

Scott and Jennifer Cole's Personal Financial Activities

Scott did not always deposit his legal services fees into the Bentley Group's account. Scott deposited $79,294 into the personal checking account of his wife, Jennifer Cole (Jennifer), and deposited $6,475 into his personal bank account in 2001. Scott and Jennifer used the funds in these accounts to pay a variety of personal expenses including their children's school tuition and music lessons and residential landscaping.

Scott failed to report the legal services fees he generated in 2001 as taxable wage or self-employment income regardless of which account the amounts were credited. In addition, Scott failed to report any amounts he withdrew from the Bentley Group's account as taxable wage or self-employment income even though he withdrew $1 million plus for personal nonbusiness purposes.

Scott freely transferred amounts in the Bentley Group's account to his family and friends without keeping sufficient documentation of the transfers or reporting the transactions. For example, he transferred $50,000 from the Bentley Group's bank account to his mother. Scott also lent his father $40,000 from the Bentley Group's account. Scott used this transaction to further convolute the tracing of his income and told his father, rather than paying him back directly, to make a contribution to his church for $40,000 in Scott's name. Scott and Jennifer, thereafter, claimed a $40,000 charitable contribution deduction yet failed to report any of that amount as taxable wage or self-employment income. Scott also lent $300,000 to a friend for options trading and made a loan to his brother Mark for Mark's roofing company. Scott has not provided any records or other documentation to show that any amount withdrawn from the Bentley Group's account was not taxable. In addition, he has failed to show any business purpose for these transfers.

Scott also created an LLC known as JAC Investments, LLC (JAC). JAC are the initials for Jennifer A. Cole. JAC reported its principal business activity as "Investments" although there is nothing in the record to show any stock transactions. Rather, JAC operated as a conduit to which Scott transferred and assigned income from his legal services. JAC reported taxable deposits for 2001 of $79,652 and claimed $28,647 of expenses, though none of these expenses have been substantiated. Deposits into JAC's bank account were almost exclusively checks made payable to Scott individually, not JAC. Jennifer is a college graduate and had previously worked as an accountant. In 2001 she was a homemaker and had no income of her own, yet Scott reported her as owning a 99-percent interest in JAC with him owning a 1-percent interest in JAC. Scott reported self-employment tax on only $1,162 of income for 2001.

Scott formed and solely owned Scott C. Cole, P.C. (SCC), an Indiana professional corporation in 1997.[4] The Indiana Secretary of State administratively dissolved SCC in 2001 because SCC did not file its required business entity reports. SCC had no assets and did not appear to serve any business purpose. In 2005 Scott filed a tax return for SCC for 2000, the first and only tax return filed for SCC. SCC did not report receiving any income

---

[4]Scott asserts that SCC was a partner in the Bentley Group, rather than he as an individual. We find no evidence to support this claim.

from the Bentley Group's account in 2001. SCC reported gross receipts of $158,553 and taxable income of $738 with a reported tax due of $258.

Scott transferred or assigned over $1 million in legal services fees in 2001 from the Bentley Group to at least seven different accounts. Scott commingled amounts in the Bentley Group's account with amounts in other accounts including JAC's account, SCC's account, Jennifer's personal account, Scott's personal account, his father's business account, and his mother's account. Scott and Jennifer failed to report, however, any wages or salaries, Schedule C income, or income from the Bentley Group or Cole Law Offices on their joint tax return for 2001. Instead, the joint tax return reflected only $341 of tax liability and $164 of self-employment tax liability. Scott subsequently filed for bankruptcy in 2002, at which time he failed to disclose any interest in the Bentley Group, Cole Law Offices, or any other law practice.

Darren and Lisa Cole's Personal Financial Activities

Darren also failed to report the amounts he withdrew from the Bentley Group's account on any tax return for 2001. Darren's primary source of income during 2001 was from the practice of law. This income was paid through the Bentley Group or directly to Darren. Like Scott, Darren transferred his legal services fees to multiple accounts. Darren maintained no bank account in

his own name during 2001. Darren deposited checks totaling $24,847, paid to him for legal services he performed, into Lisa's bank account in 2001 but failed to report this amount on their joint tax return for 2001.

Scott formed an LLC for Darren and Lisa's benefit known as LRC Investment, LLC (LRC). LRC are the initials for Lisa R. Cole. LRC, similar to JAC, served no business purpose. Darren used it as a conduit to transfer and assign his legal services fees. Darren opened a bank account in LRC's name with an initial $20,000 deposit. No explanation has been given as to where the $20,000 originated or whether it was taxable. Darren and Lisa claimed to be 50-percent partners in LRC. Darren filed an information return for LRC for 2001 reporting LRC's principal business as "Management Consulting" and concealed that he was an attorney. The Bentley Group distributed $145,930 to LRC, which LRC reported as its total gross receipts. No amount was reported on any investment or stock transaction. LRC claimed unsubstantiated expenses of $135,636. In addition to lacking documentation, no claimed expense bore any relationship to the claimed business of LRC.

Lisa represented on a car loan application that she was employed by the Bentley Group and that she received a yearly salary of $51,996. Lisa made a similar representation on a home mortgage loan application. Her yearly salary on the mortgage

loan application was represented at an increased $72,000 even though the representations were only days apart. In addition, Lisa deposited a total of $138,248 into her personal bank account during 2001. Despite these deposits and representations, Lisa failed to report any wage or self-employment income on any tax return for 2001.

Darren and Lisa withdrew a total of $198,308 from the Bentley Group's bank account in 2001 yet failed to report any amount. Lisa received at least $45,527 from the Bentley Group and other sources during 2001 but failed to report even a fraction of this amount. Lisa also made a $28,873 down payment on a house at the same time the Bentley Group's bank account reflected a withdrawal of the same amount, yet she failed to report any of this amount. Instead, Darren and Lisa reported only $10,201 in adjusted gross income on their joint tax return for 2001 and sought a $2,477 refund. They reported two minimal sources of income on the joint tax return. They reported only $2,978 from the Bentley Group and $10,294 from LRC. Darren filed for bankruptcy in 2003, at which time he failed to disclose any interest in the Bentley Group or any other law practice.

Respondent's Examination

Respondent began an examination of Scott and Jennifer's joint tax return for 2001 in 2003. Respondent assigned the audit to Revenue Agent Loretta Reed. Revenue Agent Reed met with Scott

and learned of Scott and Darren's involvement in the Bentley Group, which still had not submitted a tax return for 2001.

Revenue Agent Reed thereafter requested, due to Darren's involvement in the Bentley Group, that Darren and Lisa's joint tax return for 2001 be selected for examination. Respondent assigned Revenue Agent Reed to audit Darren and Lisa. Neither Lisa nor Darren cooperated with Revenue Agent Reed during the audit. Darren threatened that Revenue Agent Reed would be arrested if she came upon his property, and Revenue Agent Reed received no response from Lisa after sending audit notices and summonses to her. Revenue Agent Reed eventually obtained audit information by issuing third-party summonses to Darren and Lisa's banks and mortgage company.

The Bentley Group's 2001 Information Return, Form 1065

Darren filed the information return for the Bentley Group for 2001 in 2004 after the audit of both partners had begun. The Bentley Group reported gross receipts and ordinary income of $1,583,900. It also reported there were no cash distributions or transfers of partnership interests for the 2001 tax year. This was inconsistent with all the distributions made to entities and persons during 2001. The K-1s attached to the Bentley Group's information return also did not reflect reality. The K-1 on the late-filed information return reflected that Darren had a 0-percent interest in the profits and losses of the Bentley Group

and had only a 1-percent interest in its capital.  The K-1 reflected that Scott's defunct SCC owned all the profits and losses of the Bentley Group and had a 99-percent interest in its capital.  SCC had not filed any tax return for 2001.  There was no K-1 for Scott individually.

Neither Scott nor Darren filed employment tax returns for the Bentley Group, and the Bentley Group claimed no deduction on the information return for payment of unemployment taxes.  It also claimed no other expenses normally associated with operating a law practice.  Further, despite the significant legal services income the Bentley Group received during 2001, the Bentley Group did not report any legal services income for 2001.  At trial, Scott and Darren both asserted that SCC was the only partner of the Bentley Group.  Neither Darren nor Scott reported any sale of his interest in the Bentley Group to SCC on his joint tax return.

Deficiency Notices Issued

Respondent used the specific items method to reconstruct Scott's and Darren's respective incomes from the Bentley Group in 2001.  Respondent used the available records for the withdrawals that petitioners made from the Bentley Group's bank account. Respondent also did bank deposit analyses with respect to their incomes from other sources.  Respondent determined that petitioners had omitted wages and self-employment income from their joint tax returns, and respondent issued petitioners

deficiency notices and asserted fraud penalties against them. Petitioners timely filed petitions with this Court.

## Discussion

We are asked to decide whether petitioners, two attorney brothers and their spouses, failed to report over $1.5 million in income from providing legal and tax preparation services, and if so, whether such underreporting of income was attributable to fraud. Petitioners created so many different legal entities and distributed money to so many entities and individuals in 2001 that petitioners themselves were confused at trial. Petitioners failed to keep adequate invoices and records, thus making their financial dealings even more convoluted. We begin by discussing the unreported income.

## I.  Unreported Income

Gross income generally includes all income from whatever source derived. Sec. 61(a). Taxpayers must keep adequate books and records from which their correct tax liability can be determined. Sec. 6001. When a taxpayer fails to keep records, the Commissioner has discretion to reconstruct the taxpayer's income by any reasonable means. Sec. 446(b); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Factor v. Commissioner, 281 F.2d 100, 117 (9th Cir. 1960), affg. T.C. Memo. 1958-94.

The Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving that these determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Both brothers acknowledge they are attorneys and earned income from providing legal services.  In addition, Scott prepared taxes for others and testified that he understood that income earned from legal services must be reported on tax returns.  They argue nonetheless that all the income deposited in the Bentley Group's account should be assigned to SCC, a defunct entity, not them individually.

Taxpayers may not avoid their tax liability on income they earned by simply assigning income to others.  Trousdale v. Commissioner, 16 T.C. 1056, 1065 (1951), affd. 219 F.2d 563 (9th Cir. 1955).  When a taxpayer creates an entity as a pure tax avoidance vehicle, the assignment of income theory applies to tax the taxpayer for the income attributed to the entity.  See Jones v. Commissioner, 64 T.C. 1066, 1076 (1975).  There is no written evidence for 2001 to suggest that SCC was involved with the Bentley Group.  In fact, SCC was a defunct corporation that had been dissolved in 2001.  The only document suggesting that SCC was a partner of the Bentley Group was the K-1 attached to the Bentley Group's information return for 2001, but this return was not filed or prepared until after Scott and Darren were being audited.  All other evidence, including testimony at trial, shows

that Scott and Darren were the only two partners of the Bentley Group in 2001. Furthermore, not only was SCC defunct in 2001 but it reported no taxable income and paid no income tax in 2001. Accordingly, we find any money deposited into the Bentley Group's account is income allocated to Scott and Darren, not SCC.

Petitioners failed to maintain adequate records of their income. Revenue Agent Reed therefore collected financial information through third-party summonses issued to their banks and mortgage lenders. The Commissioner may use indirect methods of reconstructing a taxpayer's income. Holland v. United States, 348 U.S. 121 (1954). The reconstruction of a taxpayer's income need only be reasonable in light of all surrounding facts and circumstances. Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970). The specific items and bank deposits methods of income reconstruction used by the Commissioner have long been sanctioned by the courts. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes income, but the Commissioner must take into account any nontaxable sources or deductible expenses of which the Commissioner has knowledge. Clayton v. Commissioner, supra at 645-646. The burden is on petitioners to show that respondent's

method of computation is unfair or inaccurate.  See DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  We now focus on respondent's reconstruction of each couple's income for 2001.

A.  Scott and Jennifer—Unreported Income

Scott and Jennifer filed a joint tax return for 2001 and reported gross income of $100,276, taxable income of $18,265, and a tax liability of $505.  Respondent determined, however, that Scott received legal services and tax preparation fees far in excess of what they reported.  The Sandefur Trust paid Scott $1.2 million for his legal services, though Scott and Jennifer did not report any of the amount on their joint tax return.  In addition, Scott withdrew $1,173,263 from the Bentley Group's account in 2001, but failed to report any of the withdrawals as income. Scott claims he lent most of this money to his father, friends, and brothers and mistakenly asserts that loan proceeds are tax-exempt.  Scott's misconception about amounts lent to others does not absolve Scott from paying taxes on income he earned by providing legal services.

In addition, JAC had taxable deposits of $79,652, all coming from Scott's legal services fees, yet Scott reported self-employment tax on only $1,162 of income for 2001.  Moreover, a total of $79,294 was deposited into Jennifer's personal bank account in 2001, of which $59,264 was from Scott's legal services

and tax preparation fees.  Neither Scott nor Jennifer reported these deposits as income.  Instead, Scott and Jennifer failed to report, in toto, over $1 million in legal services fees.  They failed to report any of the legal services fees, yet they claimed a $40,000 charitable contribution deduction for amounts of legal services fees they had contributed to their church.

Respondent determined that Scott and Jennifer omitted $1,215,183 of income from their joint tax return for 2001.  Respondent also allocated income for self-employment tax purposes between the brothers and determined that Scott had $1,329,689 of unreported self-employment income for 2001 after reviewing the checks deposited into the Bentley Group's account for 2001.

We conclude that the specific items and bank deposits methods respondent used to reconstruct Scott and Jennifer's income for 2001 were reasonable and substantially accurate.  Scott and Jennifer have introduced no documentary evidence to show otherwise.  Any inaccuracies in the income reconstruction are attributable to Scott and Jennifer's failure to maintain books and records.  Accordingly, we find Scott and Jennifer had unreported income in the amounts respondent determined in the deficiency notices as adjusted.

B.  Darren and Lisa—Unreported Income

Darren and Lisa reported $10,201 of adjusted gross income and claimed a $2,477 refund on their joint tax return for 2001.

Darren testified that all of his income from the practice of law went through the partnership, yet he reported only $2,978 of the money deposited in the Bentley Group's account and $10,294 of the money deposited in LRC's account. Darren and Lisa withdrew, however, a total of $198,308 from the Bentley Group's account in 2001. Moreover, Lisa represented that she was employed and paid by the law practice, but she failed to report any income. Lisa also made a $28,873 down payment on her house directly from funds in the Bentley Group's account but failed to report any of this amount as income.

Darren and Lisa have failed to explain several omissions of income and have failed to substantiate the claimed expenses on their joint tax return. Darren and Lisa reported LRC received gross receipts of $145,930 in 2001, all coming from the Bentley Group, yet they offset the gross receipts with $135,636 of unsubstantiated expenses. We find it inconsistent that Darren and Lisa would be able to pay such excessive amounts of expenses for LRC if they had only a small amount of reportable income. The records support respondent's determination that Darren and Lisa omitted $261,684 of income from their joint tax return for 2001.

Darren earned significant legal fees working for a law practice that had ordinary income in excess of $1.5 million. Respondent determined that Darren had $198,282 of self-employment

income from the practice of law, yet Darren failed to report any self-employment income. Lisa also failed to report any earnings from the Bentley Group on their joint tax return. This conflicts with her representations about her earnings on loan and mortgage documents. Moreover, the record reflects she received funds from the Bentley Group in 2001 yet failed to report any income. Deposits totaling $138,248 were made into Lisa's bank account in 2001, and only $21,550 can be attributed to nontaxable sources. Lisa also made a $28,873 down payment on her house directly from the Bentley Group's account. Respondent determined that Lisa earned $74,399 of self-employment income in 2001.

We conclude that the specific items and bank deposits methods respondent used to reconstruct Darren and Lisa's income were reasonable and substantially accurate. Darren and Lisa have introduced no documentary evidence to show otherwise. Any inaccuracies in the income reconstruction are attributable to Darren and Lisa's failure to maintain books and records and to their failure to cooperate with respondent during the audit. We find Darren and Lisa had unreported income in the amounts respondent determined in the deficiency notice as adjusted.

II. Fraud Penalty

We next consider whether any of petitioners is liable for the fraud penalty for 2001. The Commissioner must prove by clear and convincing evidence that the taxpayer underpaid his or her

income tax and that some part of the underpayment was due to fraud. Secs. 7454(a), 6663(a); Rule 142(b); <u>Clayton v. Commissioner</u>, 102 T.C. at 646.

Fraud is a factual question to be decided on the entire record and is never presumed. <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983); <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). The Commissioner must show that the taxpayer acted with specific intent to evade taxes that the taxpayer knew or believed he or she owed by conduct intended to conceal, mislead, or otherwise prevent the collection of the tax. Sec. 7454; <u>Recklitis v. Commissioner</u>, 91 T.C. 874, 909 (1988); <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Direct evidence of fraud is seldom available, and its existence may therefore be determined from the taxpayer's conduct and the surrounding circumstances. <u>Stone v. Commissioner</u>, 56 T.C. 213, 223-224 (1971). Courts have developed several indicia or badges of fraud. These badges of fraud include understating income, failure to deposit receipts into a business account, maintaining inadequate records, concealing income or assets, commingling income or assets, establishing multiple entities with no business purpose, failing to cooperate with tax authorities, and giving implausible or inconsistent explanations for behavior. <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Bradford v.</u>

Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Although no single factor is necessarily sufficient to establish fraud, a combination of several of these factors may be persuasive evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. We will look at each couple to determine whether the fraud penalty applies with respect to either spouse.

A.    Scott and Jennifer—Fraud Penalty

We now consider whether Scott or Jennifer is liable for the fraud penalty. A taxpayer's intelligence, education, and tax expertise are relevant in determining fraudulent intent. Stephenson v. Commissioner, supra at 1006. Jennifer is college educated and worked as an accountant. Scott is an attorney and, as such, took an oath to uphold the law. In addition, Scott's legal practice included tax law and preparing tax returns for others. Scott testified that he understood that income from providing legal services is taxable, yet he failed to report the income as taxable on any return for 2001. In addition, Scott diverted most of the legal fees from the Bentley Group's account into numerous other accounts ostensibly as loans. Scott wants the Court to believe that such substantial withdrawals were loans, yet there is no documentation or records to show that a loan was made or that the person receiving the funds paid any

interest.  Further, even if such transactions were loans, that would not excuse Scott from reporting his legal services fees as income, whether directly payable to him or as a distributive share.

Scott and Jennifer commingled personal and business income without hesitation.  Scott deposited earnings from his law practice into JAC's account, in which Jennifer was a 99-percent owner, and into Jennifer's personal account.  Jennifer was aware of these deposits and wrote checks from these accounts to pay personal expenses, including her children's school tuition, landscaping payments, and her children's music lessons.

Scott and Jennifer did not report any income from the law practice on their joint tax return for 2001 even though more than $1.5 million was deposited into the Bentley Group's account.  Scott had unfettered control over the Bentley Group's account and treated the money deposited in the Bentley Group's account as his personal funds.  Scott transferred most of the money in the Bentley Group's account to relatives and friends including a transfer of $50,000 to his mother.  Scott failed to produce any records documenting his deposits and withdrawals from the Bentley Group's account and has not rebutted respondent's determination that he received over $1 million in legal services fees in 2001. The lack of records indicates that Scott was not concerned with

respecting the existence of different entities or the partners in the Bentley Group.

Scott also concealed assets. Scott deposited his legal services fees into numerous other accounts to hide income. We divine no business purpose for the LLCs Scott established. It appears they served as conduits to hide income Scott earned from providing legal services and preparing tax returns. Scott did not indicate he practiced law on any return filed or indicate that any income earned would be subject to self-employment taxes. Rather, he generally indicated he was an investor. Scott and Jennifer received over $1.2 million in income in 2001, but their joint tax return reflected only $341 of tax liability. Scott and Jennifer avoided income and self-employment taxes by assigning income from Scott's law practice to JAC and using those funds for personal purposes.

Scott also gave inconsistent answers regarding his legal and tax preparation practice. Scott testified that he considered himself a partner in the Bentley Group, and apparently he represented to others that he was a partner. He also represented that he was practicing law under Scott Cole and Associates, Cole Law Offices, and individually. He accepted checks made payable to any of these "persons" and deposited them in the Bentley Group's account regardless to whom the check was made payable. Scott showed little respect for business formalities and

effectively made the Bentley Group nothing more than a checking account.  Scott asserts that he transferred his entire interest in the Bentley Group to SCC, yet there are no documents to reflect such a transfer.  Scott did not even know whether the IOLTA account was a Scott C. Cole account or a Cole Law Offices account.  All the while he was transferring his legal services fees into seven different accounts.

We find that Scott and Jennifer used a scheme where they assigned income to an LLC to conceal the true nature of the earnings subject to income and self-employment taxes.  Scott and Jennifer claimed that JAC was an investment company.  If it was an operating company, however, it did not have any employees nor can we find that it was created for any valid business purpose.  JAC was merely created in an attempt to avoid taxation.

Several of the badges of fraud apply to Scott and Jennifer.  We conclude that respondent has proven by clear and convincing evidence that Scott and Jennifer each fraudulently understated their tax liabilities for 2001, and they have failed to show that any portion of the underpayment is not due to fraud.  Accordingly, we find that the fraud penalty under section 6663 applies to Scott's and Jennifer's underpayment of tax for 2001 as adjusted.

B.    <u>Darren and Lisa—Fraud Penalty</u>

We now consider whether Darren and Lisa are each liable for the fraud penalty.  We agree with respondent that many of the badges of fraud are equally present for Darren's and Lisa's underpayment.  Lisa worked as a paralegal at the law practice, and she had access to and signing authority over the Bentley Group's account.  Darren, an attorney, was responsible for keeping the financial records of the law practice and prepared the information return for the Bentley Group for 2001.  Darren failed to maintain or produce any records, however, evidencing deposits, withdrawals or loan transactions involving the Bentley Group's account.  Darren also did not file the requisite information return for the Bentley Group until 2004, after he and Scott were being audited.  In addition, the Bentley Group failed to file employment tax returns for Lisa, or any other employees of the law practice.  Lisa failed to report any wage income from the Bentley Group.

Darren and Lisa both earned substantial amounts from the Bentley Group, yet reported only a nominal amount on their joint tax return.  Darren never established a personal account in his name, but, like Scott, established multiple other accounts to avoid paying taxes.  Darren and Lisa reported only $10,000 of income on their joint tax return after they claimed $135,636 of unsubstantiated expenses on the information return for LRC.

Darren maintained no records to support his withdrawals and transfers to and from the Bentley Group's account.  Darren and Lisa reported that the Bentley Group paid LRC $150,000 of income, not an insignificant amount, but there was no written explanation for the payment.  Darren and Lisa also failed to cooperate with Revenue Agent Reed.  Darren threatened that he would have Revenue Agent Reed arrested if she came on his property, and Lisa was unresponsive after receiving summonses from her.

We find that Darren and Lisa, like Scott and Jennifer, used a scheme where they assigned income to an LLC to conceal the true nature of the earnings subject to income and self-employment taxes.  Darren and Lisa claimed that LRC was an investment company.  If it was an operating company, however, it did not have any employees nor can we find that it was created for any valid business purpose.  LRC was merely created in an attempt to avoid taxation.  While Darren and Lisa did pay self-employment tax on the $10,000 of net income of LRC, they claimed expenses totaling 92.9 percent of the income.  They cannot substantiate these expenses.  Perhaps no documentation was kept because LRC had no business purpose and was merely a conduit for the assignment of income.

Several of the badges of fraud apply to both Darren and Lisa.  We conclude that respondent has proven by clear and convincing evidence that Darren and Lisa each fraudulently

understated their tax liabilities for 2001, and they have failed to prove that any portion of the underpayment is not due to fraud.  We find that the fraud penalty under section 6663 applies to Darren's and Lisa's underpayment of tax for 2001 as adjusted.

III. <u>Limitations Period</u>

Because of our findings of fraud, the limitations periods for assessing petitioners' taxes have not expired.  See sec. 6501(c)(1).

We have considered all remaining arguments the parties made and, to the extent not addressed, we conclude they are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered for respondent for the reduced amounts</u>.