T.C. Memo. 2020-17

UNITED STATES TAX COURT

LON B. ISAACSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29484-14.                    Filed January 23, 2020.

<u>Joseph A. Broyles</u>, for petitioner.

<u>Cassidy B. Collins</u>, <u>Andrea M. Faldermeyer</u>, <u>Christine A. Fukushima</u>, and

<u>Priscilla A. Parrett</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Petitioner seeks redetermination of his income tax

liability for tax year 2007.  Respondent determined a deficiency of $2,583,374 and

[*2] a civil fraud penalty of $1,937,531 under section 6663.[1]  After concessions,[2] the remaining issues for decision are whether petitioner (1) failed to report taxable income for tax year 2007 and (2) is liable for the civil fraud penalty under section 6663.

This case centers on a $12.75 million settlement petitioner secured for his former clients who were abused by Catholic clergy when they were children. Specifically, this case turns on whether petitioner earned a 60% contingency fee for his services in 2007.  Several other tribunals have dealt with controversies involving these funds over the years.  In those prior proceedings petitioner consistently maintained, produced evidence in support of, and convinced other tribunals to accept as true that his former clients were satisfied with his services as an attorney when he secured this settlement in 2007 and that those clients never disputed his right to his asserted fee.  Now, however, he asserts that his fee was always in dispute.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the relevant time, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded to the nearest dollar.

[2]Among other concessions, petitioner has conceded that he understated his income for 2008 and that the resulting underpayment was fraudulent.

**[\*3]**                                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulated

facts and facts drawn from the stipulated exhibits are incorporated herein by this

reference.  Petitioner resided in California when he petitioned this Court.

A trial attorney for 38 years, petitioner specialized in, among other practice

areas, tax fraud litigation.  On May 10, 2013, petitioner was disbarred for willfully

violating rule 4-100 of the California Rules of Professional Conduct (rule 4-100),

which requires attorneys to place client funds into trust accounts, imposes various

recordkeeping requirements, and bars attorneys from commingling funds.[3]  Before

his disbarment, however, petitioner maintained an active litigation practice that

included the representation of four individuals who had been sexually abused as

---

[3]The State Bar Court of California found that petitioner willfully violated
Cal. R. Prof'l Conduct 4-100 (2007), knowingly provided false testimony, and
engaged in acts of moral turpitude.  In re Isaacson, Nos. 08-0-10684, 08-0-13687,
Cal. State Bar Ct. Unpublished Opinion, Dec. 6, 2012, at 2, available at
http://members.calbar.ca.gov/courtDocs/08-O-10684-3.pdf.  Petitioner was
disbarred by the California Supreme Court after three prior suspensions from
practice.  As conditions of being permitted to practice again, petitioner was
required to complete additional ethics training and engage a consultant who
specialized in reviewing law firm accounting and account management.  This
Court's Committee on Admissions, Ethics, and Discipline issued an order to show
cause to petitioner on September 18, 2013, as to why he should not be similarly
disciplined.  Petitioner responded on October 11, 2013, tendering his resignation
from the bar of the United States Tax Court, which the Court accepted effective
November 19, 2013.

[*4] children by members of the Catholic clergy (clergy lawsuit). Specifically, petitioner represented four individuals whom he knew personally and who considered him to be both their attorney and a trusted friend.

I.      Petitioner's Clients and Fee Arrangements

Petitioner's clients in the clergy lawsuit were Clients 1 through 4. Clients 3 and 4 are brothers (Brothers).[4]

The record does not contain copies of retainer agreements for Clients 1 and 2, but the parties stipulated that both men agreed to retain petitioner at a 60% contingency fee. The record does contain copies of the Brothers' retainer agreements. The agreements' terms are largely identical and provide that petitioner would receive "50% if the case settles prior to 120 days before the first arbitration or trial date, or 60% of the present value of all amounts recovered from any source, if the case settles or is adjudicated on or after 120 days before the first mediation, arbitration or trial date is set." The Brothers' retainer agreements also provide that they would reimburse petitioner 110% of his costs and purport to allow petitioner to deposit funds held for their benefit in a "non-IOLTA" (Interest on Lawyers' Trust Account) account, with petitioner retaining any interest earned

---

[4]The Court has anonymized the clients' names to preserve their privacy.

[*5] on amounts held in the account. Any disputes arising from the Brothers' contingency fee agreements were to be submitted to binding arbitration.

In the course of retaining petitioner, the Brothers and Client 2 made clear that they did not want any future settlement funds deposited at the Union Bank of Switzerland (UBS) and that they did not want petitioner to manage their investment activities with respect to any future settlement funds.

II.    Petitioner's Investment Account at UBS and Account Activity Before the Clergy Lawsuit Client Settlement Funds Were Deposited Into the Account

Petitioner had banked with UBS since the mid-1980s and relied on the financial advice of Richard Frankel, who had worked in the financial industry since 1971. On December 21, 2006, petitioner opened an account at UBS ending in 6151, which later was renumbered to end in 9638 (UBS account). On the documents opening the account, petitioner indicated that the account was for a sole proprietorship, listed himself as the principal officer and beneficial owner of the account, and handwrote the word "Trustee" after his law firm's typed name on the line listing the account owner's information. Petitioner did not indicate that this account was a client trust account. When opening the account, petitioner indicated that the account's investment objectives were "capital appreciation", with a "moderate" primary risk profile and an "aggressive/speculative" secondary

[*6] risk profile.  Petitioner did not indicate that the source of the account's funds would be client trust funds; instead, petitioner indicated that the source of funds would be "income from the business/organization."  In opening the account petitioner agreed that any dispute relating to the UBS account would be submitted to arbitration.

After petitioner opened the UBS account, one of Mr. Frankel's partners discussed auction rate securities with him.[5]  After learning about these securities, petitioner deposited $800,000 into the UBS account.[6]  On December 27, 2006, petitioner directed UBS to invest these funds in auction rate securities.

In November 2007 petitioner told Mr. Frankel that he expected to receive a large sum of money from the settlement of the clergy lawsuit.  Mr. Frankel told petitioner that the money should be invested in low-risk Treasury bills, but petitioner instead directed that once deposited in the UBS account, the settlement funds were to be invested in auction rate securities, which provide a higher potential return than Treasury bills.

---

[5]Auction rate securities are debt or preferred equity securities whose interest rates are periodically reset through an auction.

[6]The record does not identify the source of this $800,000.

**[*7]** III.    <u>Clergy Lawsuit Settlement and Funds Management</u>

In 2007 the Archdiocese of Los Angeles and other clerical organizations entered into a global settlement under which the payors agreed to pay approximately $660.1 million to resolve the cases of 508 victims of childhood sexual abuse by Catholic clergy.  On July 11, 2007, as part of this global settlement, petitioner appeared at an informal settlement conference in the Superior Court of California of the County of Los Angeles (Los Angeles County Superior Court) and secured a collective settlement of $12.75 million for his four clients in satisfaction of their pending claims.

To apportion this settlement among the four clients, petitioner prepared documents allocating the funds before attorney's fees were paid, as set out below, according to the level of harm suffered by each client and to which each client agreed.

| Client | Settlement allocation |
|--------|----------------------|
| 1 | $1,590,000 |
| 2 | 1,156,950 |
| 3 | 5,751,329 |
| 4 | 4,251,721 |
| Total | 12,750,000 |

**[\*8]** Petitioner charged Clients 1 and 2 a 60% fee, to which both men agreed and which they never disputed. Petitioner charged the Brothers a 60% fee as well, but the Brothers informed petitioner that they disagreed that this was the appropriate fee amount. Instead, they felt that petitioner was entitled only to a 40%-50% fee based on the timing of the settlement and their respective retainer agreements. The Brothers' concerns, however, did not lead them to arbitrate a fee dispute with petitioner, as their retainer agreement would have required. Nor did petitioner construe their statement regarding his fee as requiring him to submit the issue to arbitration.

IV.   Petitioner's Management of the UBS Account After Settlement Funds Were Deposited

After the settlement funds were deposited in the UBS account, petitioner treated the account as if it were a personal account and not an account held in trust for the benefit of his clients. For example, on December 12, 2007, petitioner had an imminent and personal need for liquidity and directed UBS to sell off $1.85 million of the auction rate securities on December 18, 2007, which UBS did. That same day petitioner again contacted UBS and stated that he no longer needed to show liquidity and directed UBS to repurchase the $1.85 million of securities just sold.

**[*9]**    Also on December 18, 2007, petitioner emailed UBS asking for clarification of which auction rate securities were "purchased for my benefit", the "amount of my present holdings, and the interest I have earned to date".  Once UBS informed him of the interest earned, petitioner authorized UBS to transfer $50,000 of earned interest to his personal trainer and social acquaintance as a gift.  Later, on December 27, 2007, petitioner sent UBS handwritten instructions to transfer $600,000 from the UBS account into his law firm's Bank of America bank account, and UBS transferred the funds that day.

After the new year petitioner continued to use and manage the funds in the UBS account.  On January 11, 2008, petitioner withdrew $100,000 from the UBS account and deposited the money into his law firm's Bank of America bank account.  On January 29, 2008, petitioner withdrew $1.3 million from the UBS account and deposited the money into another bank account he controlled at California Bank & Trust.  On January 29, 2008, petitioner paid Client 1 his portion of the clergy lawsuit settlement funds.

[*10] V.   <u>Petitioner's Lawsuit Against UBS, Subsequent Interpleader, and Various Arbitrations</u>

A.   <u>Background</u>

In February 2008 the market for auction rate securities froze. This market failure was but one part of the larger financial crisis of 2008. As an international bank, UBS faced significant exposure relating to, among other lines of business, its role in the collapse of the auction rate securities market. By March 2008 the Securities and Exchange Commission (SEC) had started examining many broker-dealer firms, including UBS. To help manage and resolve its potential exposure arising from the auction rate securities market, UBS retained Howard Privette II of Paul Hastings.

After reviewing petitioner's activity regarding the UBS account, Mr. Privette grew concerned that the UBS account was not a valid client trust account under California law and therefore posed a risk to UBS because the funds held therein could be subject to unknown ownership interests. Accordingly, on March 10, 2008, UBS placed a legal hold on the UBS account.

Beginning on April 4, 2008, petitioner sent Mr. Privette a series of letters requesting that the funds in the UBS account be unfrozen and released into his custody. In these letters, petitioner stated that the UBS account held funds owned

**[*11]** by his law firm (i.e., the fees petitioner earned on the settlement funds) as well as funds belonging to his clients (i.e., the funds allocated to each client less petitioner's legal fee). In support, petitioner attached sworn declarations (which petitioner had drafted) signed by Clients 2, 3, 4, and himself, each of which stated that the clients were satisfied with petitioner's representation of them in the clergy lawsuit case.[7] Because petitioner had, in his words, "proven that the funds and assets in * * * [the UBS account] belonging to * * * [his] three clients * * * have been identified and quantified by them under penalty of perjury", petitioner maintained that the legal hold should be lifted from the account. On April 16, 2008, on the strength of these declarations, Mr. Privette informed petitioner that UBS had lifted the legal hold on the account.

    B.    <u>The UBS Lawsuit</u>

On June 13, 2008, petitioner, Client 2, and the Brothers retained Cotchett, Pitre & McCarthy (Cotchett firm) to represent them in a lawsuit to be filed against UBS relating to the clergy lawsuit settlement funds, the UBS account, and the illiquidity of the auction rate securities market. Petitioner and his clients agreed to pay the Cotchett firm 15% of the net amounts recovered up to $11.575 million and 17% of the net amounts recovered above that amount. Additionally, petitioner and

---

[7]None of the declarations mentioned any fee dispute.

[*12] his clients agreed that any fee dispute between them and the Cotchett firm would be submitted to arbitration.

On June 19, 2008, on behalf of petitioner and his clients, the Cotchett firm filed a complaint with the Los Angeles County Superior Court against UBS, Mr. Frankel, various other UBS employees, and Mr. Privette. At its core the complaint alleged that UBS had invested the clergy lawsuit settlement funds in auction rate securities without petitioner's authorization, resulting in the funds' becoming unavailable to petitioner and his clients during the eventual freeze of the auction rate securities market.[8]

In response, on August 6, 2008, UBS and the other named defendants filed a joint petition to compel arbitration of the claims underlying the complaint, in accordance with the terms of the UBS account's creation. On the same day, Mr. Privette filed a motion to strike himself as a defendant in the UBS lawsuit.

All the while, the SEC had continued its investigation into UBS and the failure of the auction rate securities market. That investigation resulted in a preliminary settlement agreement, reached on August 11, 2008, which required UBS to buy back all illiquid auction rate securities and to enter into arbitration

---

[8]In making this allegation, the complaint detailed petitioner's representation of his clients and the clergy lawsuit settlement but made no mention of any prior or ongoing fee dispute between petitioner and his clients.

**[*13]** proceedings with those UBS customers--such as petitioner--who claimed to have suffered consequential damages.

In response to Mr. Privette's motion to strike, petitioner on August 25, 2008, filed a declaration in opposition. In that declaration, petitioner stated, among other things, that he sought liquidity in the UBS account so he could distribute to his clients the amounts each was entitled to according to the settlement allocation and petitioner's fee structure as set out above. Petitioner's declaration did not mention any fee dispute with any of his clients.

In accordance with the settlement agreement with the SEC, UBS sent petitioner a letter on October 8, 2008, offering to purchase the auction rate securities held in his account at par value.[9] Petitioner accepted this offer. On January 5, 2009, UBS repurchased the auction rate securities held in the UBS

---

[9]By this point, however, the relationship between petitioner and the Cotchett firm appears to have broken down. Though the record does not provide us with a comprehensive view of what occurred, it appears that attorneys at the Cotchett firm grew concerned with petitioner's conduct regarding the clergy lawsuit settlement and conveyed their concerns about petitioner to his clergy lawsuit clients. In response to the Cotchett firm's discussions, petitioner took action. The record does not make clear what exactly he said to the Brothers, but it is clear that by October 16, 2008, petitioner had convinced them to dismiss the Cotchett firm and consent to petitioner's substituting as their counsel going forward. Petitioner was not able to similarly secure consent from Client 2, whom the Cotchett firm continued to represent. To secure its interest in fees earned related to petitioner and the Brothers, the Cotchett firm filed a lien on October 25, 2008, relating to its claimed attorney's fees.

[*14] account--thereby restoring liquidity to the account holding the clergy lawsuit settlement funds.  On the same day, petitioner wrote to UBS requesting that UBS issue checks totaling $3,358,711.85 to the Brothers and to the Estate of Client 2[10] for $1,643,605.49 (Client 3), $1,270,562.91 (Client 4), and $444,543.45 (Estate of Client 2).  UBS responded to petitioner's request the next day, explaining that because of the Cotchett firm lien, UBS could not disburse any funds.  The funds, instead, were interpleaded to the Los Angeles County Superior Court so that the various ownership interests could be adjudicated.

C.    The Interpleader and Cotchett Firm Fee Dispute Arbitration

Before UBS interpleaded the settlement funds with the Los Angeles County Superior Court, petitioner successfully negotiated a stipulation and order for partial release of funds from his clergy lawsuit clients and the Cotchett firm that authorized UBS to disburse certain amounts to petitioner that were not subject to the Cotchett firm's lien.  On January 13, 2009, the Los Angeles County Superior Court accepted the stipulation and ordered UBS to disburse the funds in accordance with the stipulation, which it did on January 15, 2009.

On March 5, 2009, the Los Angeles County Superior Court held a hearing on UBS' motions to interplead funds and compel arbitration of the underlying

---

[10]Client 2 died on October 21, 2008.

**[*15]** dispute.  At this hearing, petitioner stated on the record that there was no fee dispute between himself and his clergy lawsuit clients, relying upon the declarations he had prepared and which his clergy lawsuit clients had signed that stated that each was satisfied with his services regarding the clergy lawsuit settlement.  The Los Angeles County Superior Court granted UBS' motion to interplead the remaining $8,281,140 held in the UBS account and also granted UBS' motion to compel arbitration of the dispute relating to the UBS account.

Once the funds were interpleaded, the Cotchett firm filed a claim to the interpleaded funds, up to $1,398,093, on the basis of their work in representing petitioner and his clients before its dismissal as counsel.  After a conference call hearing, the Los Angeles County Superior Court ordered that the interpleaded funds in excess of the Cotchett firm's claim ($6,883,047) be disbursed to petitioner.

On June 10, 2009, petitioner and the Cotchett firm arbitrated their dispute. In that proceeding, petitioner did not state that a fee dispute existed between himself and any of his clients; he contended instead that his clients were satisfied with his services and provided his clients' declarations to that effect.  On August 21, 2009, the arbitrator issued his recommended award and findings relating to the dispute between petitioner and the Brothers against the Cotchett firm.  Among

**[*16]** other things, the arbitrator determined that "[n]one of * * * [petitioner's] clients ever challenged or even questioned any right or amount of attorney's fees charged by or paid to * * * [petitioner] in connection with the sexual abuse litigation."

On the strength of that determination as well as others not relevant here, the arbitrator recommended that the Los Angeles County Superior Court disburse the remaining interpleaded funds (then $1,398,093 plus accrued interest), with $546,000 to the Cotchett firm and the balance paid to petitioner in trust for himself and the Brothers. The Los Angeles County Superior Court adopted the findings and recommendation of the arbitrator's award, and, on October 27, 2009, ordered that the interpleaded funds be disbursed to petitioner in total, from which the Los Angeles County Superior Court ordered petitioner to pay the Cotchett firm $546,000.

D.      The UBS-FINRA Arbitration and Subsequent Los Angeles County Superior Court Ruling

Although the dispute regarding the allocation of the clergy lawsuit settlement funds among petitioner, the Brothers, and the Cotchett firm was resolved in 2009, the substantive securities law claims petitioner and his clients

[*17] alleged against UBS remained in dispute.[11]  In the light of UBS' motion to compel arbitration of these claims discussed above, petitioner on November 25, 2009, filed a statement of claim for relief with the Financial Industry Regulatory Authority (FINRA) to arbitrate the claims.  The statement of claim alleged various claims against UBS, with the most relevant being that UBS had invested the clergy lawsuit settlement funds in auction rate securities without petitioner's consent or direction.

During the course of the FINRA arbitration, UBS sought, and the arbitration committee compelled production of, petitioner's income tax returns for tax years 2004 through 2009.  After disputing the relevancy of these documents, petitioner eventually produced what he said were his income tax returns, including a purported copy of his tax return for tax year 2009.  This purported copy was not the same as the income tax return petitioner actually filed with the IRS for 2009.

After much back and forth in the FINRA arbitration, the parties agreed to settle all substantive claims asserted in the UBS lawsuit (and derivatively the

---

[11]The interpleader and the Cotchett firm arbitration stemmed from the dispute about fees arising from the lawsuit against UBS and was compelled by the terms of the Cotchett firm's retainer agreement.  The UBS-FINRA arbitration stemmed from the substantive claims brought on petitioner and his clients' behalf by the Cotchett firm in the UBS lawsuit, and arbitration was compelled by the terms of petitioner's investment brokerage account paperwork, which he executed when he opened the account with UBS.

[*18] resulting FINRA arbitration) by December 30, 2010.  In exchange for a general release, UBS agreed to pay petitioner and the Brothers a total of $950,000.  Accordingly, the UBS lawsuit was dismissed by the Los Angeles County Superior Court on March 2, 2011.

Once a FINRA arbitration is opened, the financial industry professionals involved will have the matter recorded on their files within FINRA's Central Registration Depository.  Because a record of a client dispute or arbitration can have negative consequences for financial industry professionals, the various defendants in the UBS lawsuit and the FINRA arbitration sought to have the record of the case expunged from their FINRA records.  The FINRA arbitration panel expunged the records of most defendants, but recommended that Mr. Frankel's and a Mr. Patt's (another of the defendants in the UBS lawsuit) records be maintained because the UBS account should have been opened as an attorney-client trust account--not as the investment brokerage account that they had allowed petitioner to open instead.

Mr. Frankel and Mr. Patt then filed a motion with the Los Angeles County Superior Court to vacate the arbitration committee's finding and to expunge their records.  In January 2012 the Los Angeles County Superior Court issued its order and judgment that Mr. Frankel's and Mr. Patt's records with FINRA be expunged.

**[*19]** In doing so, the Los Angeles County Superior Court concluded that petitioner's contention that UBS had invested the clergy lawsuit settlement funds without his authorization was "false" and "clearly erroneous." The court found that "the evidence presented * * * establishes that the funds were invested at * * * [petitioner's] direction, following detailed conversations with him concerning the investments."

With this order, the winding path of lawsuit, interpleader, arbitration, and expungement proceedings that stemmed from the clergy lawsuit settlement ended.

VI.    Petitioner's Financial Records, Income Tax Reporting, and Examination

Petitioner's financial records and his statements regarding his financial position in the years surrounding the clergy lawsuit settlement are not always consistent.

A.    Petitioner's Tax Reporting for 2005, 2006, and 2008

Petitioner reported net profits from his law practice of $33,203 on Schedule C, Profit or Loss From Business, of his 2005 Form 1040, U.S. Individual Income Tax Return. When petitioner opened the UBS account, however, he represented to UBS that his law practice generated net profits in 2005 of $75,212.

[*20] In 2006 petitioner settled cases for various clients resulting in total legal fees received of $813,000, which he reported on his 2006 Form 1040, not as income but as liabilities for client retainers.

For 2008 petitioner concedes he fraudulently failed to report a $140,000 legal fee he earned in 2008 and that he overstated various deductions by a total of $831,154 on his 2008 Form 1040.

B.      Petitioner's Books and Tax Return Preparation for 2007

In 2007 petitioner maintained his financial records in QuickBooks. Within QuickBooks he maintained three ledgers, two of which are relevant here:[12] (1) the Lon B. Isaacson & Associates ledger, in which he accounted for the business accounts of his law practice; and (2) the Lon B. Isaacson Trust & Investment Accounts ledger, in which he accounted for his attorney-client trust accounts as well as various investment accounts. Petitioner did not include the UBS account in either ledger.

To prepare his 2007 income tax return, petitioner retained Patrick Karis, C.P.A. Petitioner went to Mr. Karis' office and provided Mr. Karis with his

---

[12]The third ledger was the Lon B. Isaacson Realty, Ltd., ledger, in which he accounted for various real estate rental activity.

[*21] QuickBooks ledgers, which did not account for the UBS account, to prepare his 2007 income tax return.

Petitioner also failed to tell Mr. Karis of the existence of the UBS account. Instead, petitioner had a legal assistant at his law firm draft a memorandum (which petitioner represented to be a tax opinion letter) advising that funds held in a client trust account would not represent income.[13]  On October 6, 2008, the legal assistant provided petitioner the four-page memorandum titled "TAX PROBLEM/ CONSTRUCTIVE RECEIPT".  The memorandum purports to provide "authority supporting our position that our client, taxpayer, is not responsible to report income he never actually or constructively received."  This memorandum does not identify petitioner as the hypothetical taxpayer-client.  While it provides a cursory summation of the law of constructive receipt, it rarely deals with specific facts. The memorandum assumes that the taxpayer-client deposited funds with a custodian and that the custodian "without authorization from, or notice to the taxpayer removed the funds * * * [and] invested the compensation without the taxpayer's knowledge, notice, or acquiescence."  Because the custodian took possession of and converted the funds without authorization, the memorandum

---

[13]That employee had graduated from law school (where he had taken an introductory Federal income tax class) but had not yet passed the bar.

[*22] concludes that the funds need not be reported as income by the taxpayer-client under the doctrine of constructive receipt.

Allegedly relying on his legal assistant's memorandum, petitioner did not tell Mr. Karis about his receipt of the clergy lawsuit settlement funds, nor did he report any legal fees earned from the clergy lawsuit settlement as income on his 2007 income tax return. On November 17, 2008, petitioner filed his income tax return for 2007.

C.   Examination of Petitioner's 2007 Tax Return

Petitioner's 2007 income tax return was selected for examination. Consistent with the position he had taken before he filed his 2007 income tax return, petitioner insisted throughout the examination that the funds derived from the clergy lawsuit settlement did not constitute income because UBS had invested the funds without his authorization. On August 5, 2013, for instance, petitioner emailed his authorized representative a copy of his legal assistant's 2008 memorandum. In that email petitioner repeatedly told his authorized representative that UBS "stole" the funds held in the UBS account and invested them without his authorization. Petitioner did not mention that the Los Angeles County Superior Court had decided more than a year before that this story was

[*23] false.  Neither did petitioner mention any alleged fee dispute with his former clients.

On October 15, 2014, the Commissioner issued to petitioner a notice of deficiency determining a deficiency and a fraud penalty for tax year 2007, from which petitioner timely petitioned this Court.  A trial in this case was held before Judge Wherry on May 5, 2016.  On January 1, 2018, Judge Wherry retired from judicial service.  The Court then issued an order asking the parties to consent or object to the reassignment of this case to another judicial officer "for purposes of preparing the opinion and entering the decision based on the record of trial previously held".  Both parties consented to reassignment of the case, and the case was reassigned to Judge Marvel on May 23, 2018.  On June 11, 2019, this Court held a supplemental trial regarding whether respondent complied with the written supervisory approval requirements under section 6751(b) with respect to the determined section 6663 civil fraud penalty.  At the supplemental trial, respondent introduced a Civil Penalty Approval Form, signed by Stephen Lepore and dated August 28, 2014.  Mr. Lepore supervised Revenue Agent Bernard Trapp's examination of petitioner's return and approved Mr. Trapp's assertion of the section 6663 civil fraud penalty in writing.

**[\*24]** ULTIMATE FINDINGS OF FACT

Although it has a tangled background, this is a simple case. Petitioner was an attorney who specialized in tax fraud defense. In the clergy lawsuit petitioner's clients agreed to pay petitioner a 60% fee for his legal services and never filed a fee dispute arbitration about petitioner's fee. Petitioner received the clergy lawsuit settlement funds into the UBS account--which he alone controlled--in December 2007. In doing so, he commingled his fee and his clients' funds in that account. Also in December 2007 petitioner exercised dominion and control over the funds, repeatedly using the funds and interest earned on the funds for his personal enjoyment. Petitioner failed to account for these funds in his business ledgers, however, and chose not to report his claimed 60% fee as income for 2007. Petitioner also repeatedly claimed in several prior proceedings that his clients never disputed his fee. Those tribunals dealing with those proceedings accepted and found as a fact that no fee dispute existed. Petitioner also repeatedly claimed that UBS had invested the clergy lawsuit settlement funds in auction rate securities without his authorization. This was untrue when first asserted and remained untrue when petitioner asserted it again throughout the examination of his 2007 income tax return.

**[*25]** In short, (1) petitioner had dominion and control over all of his claimed 60% fee in 2007; (2) he exercised dominion and control over the entire amount for his personal use in 2007; (3) he failed to report his asserted 60% fee as income for 2007; (4) he repeatedly claimed, succeeded in convincing prior tribunals to find as a fact, and personally benefited from prior tribunals' finding that no fee dispute existed between him and his clients; and (5) he asserted untrue theories regarding the ownership and investment decisions relating to the clergy lawsuit settlement funds in various proceedings--including this one.

## OPINION

Petitioner bears the burden of proving that the deficiency determination in the notice of deficiency is incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Conversely, respondent bears the burden of proving new matters asserted in his answer and not determined in the notice of deficiency. See Rule 142(a). Finally, respondent bears the burden of proving, by clear and convincing evidence, that petitioner is liable for the section 6663 civil fraud penalty. See Rule 142(b). If respondent meets that burden, we presume that the entire underpayment is attributable to fraud unless petitioner can show by a preponderance of the evidence that some portion is not attributable to fraud. See sec. 6663(b).

**[*26]** I.     Unreported Income

In the notice of deficiency respondent determined a deficiency of $2,583,374 stemming from petitioner's unreported legal fee income in 2007.  In cases appealable to the U.S. Court of Appeals for the Ninth Circuit, as this case is, absent a stipulation to the contrary, see sec. 7482(b), the Commissioner's determination that a taxpayer underreported income is presumed correct only if it is supported by a minimal factual foundation, see Palmer v. United States, 116 F.3d 1309, 1312 (9th Cir. 1997).  If the determination is so supported, the burden of proof rests with the taxpayer to prove that the determination is incorrect.[14]  The various stipulations and exhibits in the record--including without limitation petitioner's UBS account statements, his fee arrangements with his clients, and the voluminous record of prior proceedings--provide this foundation.  Petitioner therefore bears the burden of proving that respondent's deficiency determination is incorrect.

In his amended answer, respondent asserted an increased deficiency of $2,824,102 for tax year 2007; respondent bears the burden of proof as to the $240,728 increase.  See Rule 142(a).

---

[14]The burden of proof as to persuasion generally does not shift unless the requirements of sec. 7491(a) are met.  See Rule 142(a)(2).

**[\*27]** Generally, gross income means all income from whatever source derived. Sec. 61(a). When a taxpayer reports his income under the cash basis method of accounting, the taxpayer must report income for the earliest year that he actually or constructively receives the income. Sec. 1.451-1(a), Income Tax Regs. If a taxpayer has money credited to his account, has money set aside for him, or otherwise has money made available so that the taxpayer may draw upon it at any time, the taxpayer has constructively received the income in that year. Sec. 1.451-2(a), Income Tax Regs. If control of the receipt of this money is subject to a substantial limitation or restriction, however, the taxpayer has not constructively received the income. Id.

Under these principles, a taxpayer does not recognize as income funds the taxpayer holds in trust for the benefit of another. Ford Dealers Advert. Fund, Inc. v. Commissioner, 55 T.C. 761, 771 (1971), aff'd, 456 F.2d 255 (5th Cir. 1972). Accordingly, when a lawyer reporting on a cash basis holds funds for the benefit of his clients in a trust account and complies with the requirements placed on trust accounts by the relevant rules of professional conduct, the funds are not income to the lawyer. See Miele v. Commissioner, 72 T.C. 284, 290 (1979); see also Canatella v. Commissioner, T.C. Memo. 2017-124, at \*14-\*15. Once the lawyer has performed work for the client and billed for his services against amounts held

**[\*28]** in the client trust account, however, the lawyer has earned that amount without substantial limitation on his right to the funds. See Miele v. Commissioner, 72 T.C. at 290. Because the lawyer has constructively received the income, that amount represents income in the year earned. See id.; see also Canatella v. Commissioner, at \*14-\*15.

A.    California Client Trust Accounts Under Rule 4-100

Rule 4-100(A), as in effect in 2007, provided that a lawyer must deposit client funds into one or more identifiable "bank accounts". For non-IOLTA client trust accounts,[15] California law in 2007 permitted a lawyer to hold client trust funds in "one or more interest bearing bank accounts or other trust investments as may be permitted by the Supreme Court, with the interest or dividends earned on the accounts payable to clients". Cal. Bus. & Prof. Code sec. 6211(b) (West 2007). The California Supreme Court, however, had not and to date has never permitted attorneys to use investment accounts or anything other than a depository bank account as a permissible non-IOLTA client trust fund. See Cal. Prac. Guide Prof. Resp. ch. 9-B, sec. 9:72.2 (2019).

---

[15]Petitioner concedes that the UBS account was not an IOLTA client trust account. Therefore, we discuss only the requirements of non-IOLTA client trust accounts under California law.

**[*29]** Regardless of the type of client trust account, with very limited exceptions, a lawyer must not deposit funds belonging to the lawyer in the client trust account or otherwise commingle funds in the account. Rule 4-100(A). The lawyer must remove his portion of fees earned as soon as possible. Rule 4-100(A)(2). If there is a dispute as to the lawyer's fee, however, "the disputed portion shall not be withdrawn until the dispute is finally resolved." Id. In managing client trust accounts, a lawyer must maintain adequate records "of all funds, securities, and other properties of a client * * * and render appropriate accounts to the client regarding them". Rule 4-100(B)(3).

B.      The Parties' Arguments Regarding Rule 4-100

Petitioner contends that his fee with respect to the clergy lawsuit settlement (the funds of which were deposited in the UBS account in December 2007) should not be included in his income for tax year 2007 because the Brothers allegedly disputed his fee. Because the Brothers allegedly disputed his fee, petitioner argues, pursuant to rule 4-100(A)(2) he could not ethically disburse his fee from the account. Instead of being properly includable in income for 2007, petitioner contends his fee was properly includable for tax year 2009--the year in which the fee dispute was allegedly resolved. Petitioner also argues that the section 6501

**[\*30]** statute of limitations on assessment bars assessment and collection of any income tax liability for 2009.

In support, petitioner relies on various California attorney discipline cases as well as our prior decision in <u>Miele v. Commissioner</u>, 72 T.C. 284.[16] On the basis of the California cases, petitioner argues that the alleged fee dispute prevented him from withdrawing his fee and so his interest was not fixed. Relying on <u>Miele</u>, petitioner also argues that we have recognized that a State's rules of professional practice can impose a barrier to the withdrawal of funds from a client trust account until "earned". Because petitioner could not withdraw the funds on account of an alleged fee dispute under California law, he has not "earned" the funds within the meaning of <u>Miele</u> and so the funds were not income for 2007.

Respondent counters with several arguments for why rule 4-100 cannot shield petitioner from recognizing income for 2007 from the clergy lawsuit settlement.

First, respondent contends that because the UBS account was not a client trust account within the meaning of California law, rule 4-100(A) could not

---

[16]<u>E.g.</u>, <u>Silver v. State Bar</u>, 528 P.2d 1157, 1162 (Cal. 1974); <u>Fracasse v. Brent</u>, 494 P.2d 9, 13 (Cal. 1972); <u>Fair v. Bakhtiari</u>, 125 Cal. Rptr. 3d 765, 776 (Ct. App. 2011); <u>Kallen v. Delug</u>, 203 Cal. Rptr. 879, 885 (Ct. App. 1984); <u>In re Fonte</u>, 2 Cal. State Bar Ct. Rptr. 752, 758 (Review Dept. 1994).

[*31] impose any limitations on funds held within the UBS account. Respondent notes that although California law allowed for the possibility of investment accounts being used to hold client trust funds, it expressly conditioned that possibility on the California Supreme Court's approving such accounts for client trust funds. Cal. Bus. & Prof. Code sec. 6211(b). Because the California Supreme Court has never approved such accounts, respondent contends that the only permissible non-IOLTA client trust account type is a bank account. In respondent's view the UBS account was not a bank account; it was an investment brokerage account that cannot qualify as a non-IOLTA client trust account and is not subject to the limitations rule 4-100 imposes on those accounts. Therefore, respondent argues that rule 4-100 posed no limitation on petitioner's access to the funds once deposited.

Second, respondent argues that even if the UBS account was a non-IOLTA client trust account, petitioner's ongoing violations of the conditions of rule 4-100 show that the petitioner did not abide by the rule. Respondent contends that petitioner commingled his funds with his clients' funds, appropriated interest earned on the settlement funds belonging to his clients, failed to promptly resolve any alleged disputes as to his fee through appropriate channels, and failed to keep and provide to his clients an appropriate accounting of the settlement funds.

**[\*32]** Because of these violations of rule 4-100, respondent urges that rule 4-100 did not limit petitioner's access to the funds held in the UBS account in 2007.

Finally, even if rule 4-100 substantially limited petitioner's right to some portion of the funds in the UBS account, respondent contends that petitioner still should have included the undisputed portion of his fees in income and that portion of the disputed funds to which petitioner had a claim of right--even if he might later have had to repay some portion to his clients. In support, respondent also relies on our prior Opinion in Miele as well as the claim-of-right doctrine applicable to cash basis taxpayers. Respondent contends that Miele requires that an attorney who has an established fee arrangement, performs work related to that arrangement, and holds client trust funds in a client trust account to include his undisputed fee amounts as income even if the amounts are held in a trust account and are not transferred to the taxpayer's operating or personal account. Moreover, respondent contends that petitioner also should have included as income those amounts disputed by his clients because he had a claim of right over the funds even if he allegedly later had to repay the amounts to his clients after any fee dispute was resolved. Because petitioner had a claim of right (even if there was a pending dispute) over his total asserted fee amounts, respondent contends that petitioner should have included these amounts as income for 2007.

**[*33]** C.     Analysis

As noted above, petitioner's primary argument for omitting his fee from income for 2007 is that rule 4-100 limited his right to remove the fee from the UBS account because there was a fee dispute. On the record before us, we conclude that the doctrine of judicial estoppel bars petitioner from asserting this position. Moreover, even if a fee dispute existed, we conclude that rule 4-100-- assuming it applies to petitioner's UBS account[17]--did not impose a substantial limitation on petitioner's access to the funds. On the contrary, petitioner's conduct in establishing, directing the investment activities of, and failing to properly account for the UBS account--all of which violate the terms of rule 4-100--proves that at no point did rule 4-100 actually limit petitioner's access to the funds held therein. Petitioner refused to conform his behavior to the limits of rule 4-100 while in practice; he cannot now wield it as a shield to reporting income he in fact earned in tax year 2007.

---

[17]Petitioner's argument assumes that the UBS account was a valid client trust account within the meaning of California law. Respondent, in his answering brief, challenges this threshold assumption. We need not resolve this question of California law because we conclude that, in any event, petitioner did not conform his conduct to the rule even assuming it applied to the UBS account.

**[*34]**     1.     <u>Judicial Estoppel Bars Petitioner From Asserting That a Fee Dispute Existed</u>.

Petitioner argues that he could not recognize income from the clergy lawsuit settlement because clients disputed his fees and, under rule 4-100, he was barred from disbursing his fee until that fee dispute was resolved.  In prior proceedings, however, petitioner took precisely the opposite tack; he repeatedly represented, and earlier tribunals accepted as true, that no fee dispute existed between him and his clients.

Judicial estoppel is an equitable doctrine we may invoke in our discretion "to protect the integrity of the judicial process" and "to prevent [the] 'improper use of judicial machinery'".  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-750 (2001) (first quoting <u>Edwards v. Aetna Life Ins. Co.</u>, 690 F.2d 595, 598 (6th Cir. 1982); and then quoting <u>Konstantinidis v. Chen</u>, 626 F.2d 933, 938 (D.C. Cir. 1980)).  Under the doctrine, where a party has "assum[ed] a certain position in a legal proceeding, and succeed[ed] in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position".  <u>Id.</u> at 749 (quoting <u>Davis v. Wakelee</u>, 156 U.S. 680, 689 (1895)).  The U.S. Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie absent a stipulation to the contrary, examines three factors in assessing whether to apply judicial

**[\*35]** estoppel: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party succeeded in persuading the prior tribunal to accept the earlier position; and (3) whether the party seeking to assert the inconsistent position would "derive an unfair advantage". Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC, 692 F.3d 983, 994 (9th Cir. 2012) (quoting New Hampshire, 532 U.S. at 750-751); see also Fazi v. Commissioner, 105 T.C. 436, 444-445 (1995); Huddleston v. Commissioner, 100 T.C. 17, 26 (1993). In applying these factors, our paramount concern is to protect "the dignity of judicial proceedings" from a party "playing fast and loose with the courts." Milton H. Greene Archives, Inc., 692 F.3d at 993 (quoting Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001)).

We do not invoke judicial estoppel lightly. Rather, we are careful to consider how it can "imping[e] on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." Fazi v. Commissioner, 105 T.C. at 445 (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)). In appropriate circumstances, however, we apply the doctrine because to fail to do so would reward a litigant's "cynical gamesmanship". Huddleston v. Commissioner, 100

**[*36]** T.C. at 26 (quoting <u>Teledyne Indus., Inc.</u>, 911 F.2d at 1218); <u>see also</u>

<u>Baughman v. Walt Disney World Co.</u>, 685 F.3d 1131, 1133-1134 (9th Cir. 2012).

Petitioner's current position directly contradicts his position in the Los

Angeles County Superior Court interpleader proceedings. Before that tribunal,

petitioner believed it was in his interest to say that his clients were satisfied with

his services, so he claimed, and produced declarations in support of that claim,

that no fee dispute existed. On the basis of this representation and the evidence

petitioner submitted, the court-ordered arbitration accepted and found as a fact that

no dispute existed.[18] The Los Angeles County Superior Court in turn ordered that

the interpleaded funds be distributed to petitioner, in reliance on the arbitrator's

finding that there was no fee dispute.

Now that it is in petitioner's interest to say that his clients were not satisfied

with his services and that a fee dispute existed in 2007, his story has changed. In

sworn testimony, petitioner repeatedly stated that the Brothers always disputed his

fee. In so testifying, petitioner ignored and did not even mention the Los Angeles

---

[18]As noted above, the arbitrator's sixth determination reads: "None of Respondent Isaacson's clients ever challenged or even questioned any right or amount of attorney's fees charged by or paid to the Respondent Isaacson in connection with the sexual abuse litigation."

**[*37]** County Superior Court's reliance on his earlier representations that no fee dispute existed.

Plainly, these positions cannot both be true--a fee dispute is no Schrödinger's cat. As a trial court, we ordinarily do not shirk from our duty to determine what facts are proven by the record before us. Petitioner asks us to do something fundamentally improper, though; he would have this Court question, and perhaps contradict, a sister tribunal's nearly decade-old finding, made in reliance on his representations before that tribunal. Worse still, the prior finding that petitioner would have us question resulted in a substantial distribution of funds to him. What petitioner asks us to do, in short, is reward his "cynical gamesmanship". See Huddleston v. Commissioner, 100 T.C. at 26 (quoting Teledyne Indus., Inc., 911 F.2d at 1218).

We decline the invitation.

In these limited circumstances, we hold petitioner to his prior representations that were accepted as true and relied upon by a prior tribunal. To not do so would wrongly encourage "the perception that either the first or the second court was misled," New Hampshire, 532 U.S. at 750 (quoting Edwards, 690 F.2d at 599), and reward further "manipulation of the judicial process", Huddleston v. Commissioner, 100 T.C. at 26. Because we estop petitioner's

[*38] argument regarding the existence of a fee dispute, we find that petitioner has failed to carry his burden to disprove the deficiency determined in the notice of deficiency. We further conclude that, as to the new matters asserted in his answer, respondent has carried his burden of proof. The stipulations and evidence in the record clearly establish the following facts. Petitioner's clients retained him for legal services. Petitioner claimed entitlement to a 60% contingency fee throughout the representation, before each prior tribunal, and throughout this case. In December 2007 the clergy lawsuit settlement funds were wired into petitioner's UBS account. From that moment petitioner had no substantial limitation on his right to his asserted fee, so his total fee was reportable as income to him for 2007. See Miele v. Commissioner, 72 T.C. at 290.

> 2.     Even If There Was a Fee Dispute With His Other Clients,
>         Petitioner Undisputedly Earned His Fees Related to Clients
>         1 and 2 in 2007.

Even if a fee dispute existed between petitioner and the Brothers, petitioner still would have had to report his fees from Clients 1 and 2 for 2007. Petitioner does not dispute that he received the clergy lawsuit settlement payment in 2007. Petitioner also does not dispute that these two of his clients understood and did not dispute his 60% fee. Absent a dispute as to the fee amount, all the events which fixed petitioner's right to his 60% fee from each of these clients had transpired by

**[\*39]** the end of tax year 2007.  Consequently, petitioner should have recognized income for 2007 as to his 60% fee relating to these two clients, even if there was a dispute between petitioner and other clients.

3.  Even If There Was a Fee Dispute Between Them, Petitioner Did Not Abide by Rule 4-100 With Regard to the Brothers' Settlement and Fees.  He Exercised Dominion and Control Over the Entire Clergy Lawsuit Settlement, and Therefore Rule 4-100 Imposed No Substantial Limitation on Petitioner's Access to His Fees Related to the Brothers Held in the UBS Account.

Even if there was a fee dispute with the Brothers, moreover, petitioner can find no shelter within rule 4-100 now because he did not abide by it while in practice.  Petitioner relies primarily on our prior Opinion in Miele v. Commissioner, 72 T.C. 284, to support his argument that a fee dispute places the funds beyond recognition because the rules of professional conduct limited his rights to the funds.  Interestingly, respondent also relies on Miele for the opposite conclusion--that petitioner should have recognized his full asserted fee amount for tax year 2007.

Petitioner misreads Miele.[19]  In that case, we considered the impact of the Pennsylvania Code of Professional Conduct on when a taxpayer-attorney must

---

[19]Petitioner also cites a number of California cases, see supra note 16, that are inapplicable because this case does not turn on California law.

[*40] recognize income from funds held in a client trust account. The taxpayers there practiced law and reported their income on a cash basis. Miele v. Commissioner, 72 T.C. at 285. They maintained a client trust account "[i]n compliance with Pennsylvania's Code of Professional Responsibility" and placed all client advances, including advances for both future client costs and future legal services, into their client trust account. Id. The taxpayers complied with all "segregation and accounting measures" required for such accounts and maintained "a ledger card reflecting all client transactions." Id. When a client's case closed, the firm would transfer all earned fees from the client trust account into the firm's operating account (and refunded any remainder to the client). In their books of account, the taxpayers recognized income only when funds were actually transferred from the client trust account into the firm's operating account. For administrative purposes, the firm chose to make these transfers only quarterly, avoiding transferring funds in November and December if possible. Id. at 286. Therefore, when the taxpayers prepared their Federal income tax returns, they reported only their share of income actually transferred to the firm's operating account but did not report fees that had been earned but not actually transferred out of the client trust account.

**[\*41]** We determined that the taxpayers had to recognize income once their fees had been billed and could have been removed from the client trust account even if the funds had not, in fact, been removed.  Id. at 291.  In doing so, we recognized that the Pennsylvania Code of Professional Conduct imposed a substantial limitation on funds held by the taxpayer-attorneys for their clients.  That limitation gave way once the attorneys billed their fees and had an unrestricted right to access them.  Id. at 290.

Critical to our decision in Miele was the fact that the attorneys consistently complied with the restrictions on commingling funds, accounting, and account maintenance imposed by the rules of professional conduct.  Id. at 285, 289-291.  Contrary to petitioner's reading, Miele stands for the unremarkable proposition that where a taxpayer-attorney abides by the rules governing client trust accounts, and those rules require that funds be segregated and accounted for separately from the taxpayer-attorney's own funds, then funds held in a client trust account are included in income only once a fee is earned against those funds.

Our recent opinion in Canatella v. Commissioner, T.C. Memo. 2017-124, confirms this reading of Miele v. Commissioner, 72 T.C. 284.  There we considered how rule 4-100--the same rule under which petitioner now seeks refuge--affects a California attorney's recognition of income.  The taxpayer-

[*42] attorney there maintained several bank accounts which he argued were either IOLTA or non-IOLTA client trust accounts within the meaning of California law. Relying on Miele, we recognized that rule 4-100 could impose a substantial limitation on the taxpayer-attorney's right to funds held in these accounts. Canatella v. Commissioner, at *14-*15. The taxpayer-attorney in Canatella, however, failed to comply with rule 4-100. The purported client trust accounts were "not labeled * * * client trust account[s]" and the taxpayer-attorney regularly commingled funds. Id. at *15. Because the taxpayer-attorney did not "follow the labeling, anticommingling, and record-keeping requirements" of rule 4-100, we held that all funds in the accounts were reportable as income (except for amounts actually paid out to his clients) because the taxpayer-attorney treated those funds "as 'belonging to him.'" Id. (citing Healy v. Commissioner, 345 U.S. 278, 282 (1953)).

Petitioner's argument is essentially identical to that of the taxpayer-attorney in Canatella and, like the taxpayer-attorney there, petitioner "did not follow the California Rules of Professional Conduct for client trust accounts". Id. at *16. We see no reason to stray from our analysis in Canatella.

Petitioner repeatedly ignored the rule 4-100 limitations on his conduct and affirmatively misused the funds held in and generated by the account for his

**[\*43]** personal benefit. Petitioner disregarded his clients' wishes and directed that once the clergy lawsuit settlement funds--which belonged to his clients--were deposited they should be invested in auction rate securities. In doing so, and ignoring the rule 4-100 directive that his fee be removed from the UBS account as soon as possible, petitioner kept his money commingled with his clients' money.

Once his clients' funds were invested in auction rate securities, petitioner directed that a large portion of this investment be sold and then repurchased the following day because he needed to demonstrate personal liquidity. Violating rule 4-100, petitioner skimmed interest earned at least in part on his clients' funds for personal expenses, including a gift of $50,000 to his personal trainer.

This course of conduct indicates that, from the moment petitioner established the UBS account, he intended to use the funds therein for his own benefit. Once the clergy lawsuit settlement funds were deposited into the account, he did just that. Rule 4-100 did not operate as any constraint on petitioner's use of the funds for his own benefit. Accordingly, even assuming there was a fee dispute between him and the Brothers, petitioner should have recognized his asserted fees as income for 2007.[20]

---

[20]Respondent urges us to conclude that petitioner also should have reported his fee as income for 2007 because he had a claim of right to the funds in that year,

(continued...)

**[\*44]** II.    <u>Civil Fraud Penalty</u>

Section 6663 imposes a 75% penalty on any underpayment of tax if the underpayment is due to fraud.  Sec. 6663(a).  The Commissioner bears the burden of proving fraud by clear and convincing evidence,[21] <u>see</u> sec. 7454(a), and to meet

---

[20](...continued) even if his clients had a countervailing claim because of an alleged dispute.  Under the "claim of right" doctrine, a taxpayer must treat funds received as income "even though the recipient may be under a contingent obligation to return it at a later time."  <u>Nordberg v. Commissioner</u>, 79 T.C. 655, 664 (1982), <u>aff'd without published opinion</u>, 720 F.2d 658 (1st Cir. 1983).  We apply this doctrine where "a taxpayer receives earnings under a claim of right and without restriction as to its disposition * * * even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."  <u>Id.</u> at 664 (quoting <u>N. Am. Oil Consol. v. Burnet</u>, 286 U.S. 417, 424 (1932)).  Accordingly, "[t]he mere fact that income received by a taxpayer may have to be returned at some later time does not deprive it of its character as taxable income when received."  <u>Woolard v. Commissioner</u>, 47 T.C. 274, 279 (1966).  Instead, that income must be recognized for the year it is received and, if the taxpayer later must repay it, there may be a deduction available for a future year.  E.g., <u>Hamlett v. Commissioner</u>, T.C. Memo. 2004-78.
    We need not rule on respondent's argument regarding the claim-of-right doctrine. We note, however, that petitioner maintained his claim of a 60% fee throughout his representation, the various arbitration and interpleader actions, and in his testimony before this Court.

[21]Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal."  <u>Ohio v. Akron Ctr. for Reprod. Health</u>, 497 U.S. 502, 516 (1990) (quoting <u>Cross v. Ledford</u>, 120 N.E.2d 118, 123 (Ohio 1954)).

[*45] that burden must show that (1) an underpayment exists and (2) the taxpayer intended to evade taxes known to be owing through conduct intended to conceal, mislead, or otherwise prevent the collection of taxes, see Sadler v. Commissioner, 113 T.C. 99, 102 (1999).

To prove that an underpayment exists, the Commissioner must present evidence beyond the taxpayer's failure to prove error in the deficiency determination but need not establish the precise amount of the deficiency. See DiLeo v. Commissioner, 96 T.C. 858, 886 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). To prove that the taxpayer intended to evade taxes, the Commissioner may rely on circumstantial evidence because fraud is rarely provable by direct evidence alone. See Estate of Trompeter v. Commissioner, 279 F.3d 767, 773 (9th Cir. 2002), vacating and remanding 111 T.C. 57 (1998). The existence of certain badges of fraud allows a court to infer fraudulent intent. Maciel v. Commissioner, 489 F.3d 1018, 1028 (9th Cir. 2007), aff'g in part, rev'g in part T.C. Memo. 2004-28.

Respondent alleges that the following badges are present to prove fraudulent intent: (1) consistently understating income; (2) failing to maintain adequate records; (3) offering implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with authorities; (6) filing false documents; and (7) providing false testimony. See Parks v. Commissioner,

**[\*46]** 94 T.C. 654, 664-665 (1990).  We consider these indicia in the light of the taxpayer's sophistication, education, and experience.  Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

If the Commissioner establishes by clear and convincing evidence that some portion of the underpayment is attributable to fraud,[22] the entire underpayment is deemed attributable to fraud except to the extent that the taxpayer can show (by a preponderance of the evidence) that a particular portion is not attributable to fraud.  See sec. 6663(b).

---

[22]Respondent also bears the initial burden of production regarding the civil fraud penalty under sec. 6663.  To meet this burden of production, respondent must introduce evidence that it is appropriate to impose the penalty and that respondent's agents complied with the supervisory approval requirements imposed by sec. 6751(b)(1).  See Clay v. Commissioner, 152 T.C. 223 (2019); Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).  Sec. 6751(b)(1) provides that no penalty shall be assessed unless the Commissioner's agent secures written supervisory approval before the first formal assertion of the penalty.  Clay v. Commissioner, 152 T.C. at 249.  Respondent has introduced a Civil Penalty Approval Form, signed by Stephen Lepore and dated August 28, 2014.  Mr. Lepore supervised Revenue Agent Bernard Trapp's examination of petitioner's return and approved the assertion of the civil fraud penalty in writing before it was first formally communicated to petitioner.  Consequently, we conclude that respondent has met his burden of production under sec. 6751(b) as to the sec. 6663 penalty determined in the notice of deficiency.

**[\*47]** A. Underpayment of Tax

Respondent has proven by clear and convincing evidence that petitioner understated his income for 2007 and thereby underpaid his income tax liability. See supra pp. 25-43. Accordingly, respondent has met his burden of proving by clear and convincing evidence that an underpayment exists for that year. See DiLeo v. Commissioner, 96 T.C. at 886.

B. Fraudulent Intent

As noted above, we look to see whether petitioner's conduct implicates any of the badges of fraud to determine whether petitioner underpaid his tax liability with fraudulent intent. We conclude that respondent has proven by clear and convincing evidence that petitioner had that intent. We start our analysis by recognizing petitioner's high level of sophistication in Federal tax matters, and then consider the presence of several relevant badges of fraud.

 1. Petitioner's Sophistication, Education, and Experience

Petitioner is far from an ordinary litigant. He holds a law degree, he practiced as a litigator for over 30 years specializing in--among other areas--tax fraud and controversy cases, and he was admitted to practice before this Court before his disbarment in California. We have often held that a taxpayer's experience with Federal tax matters is relevant to the analysis of the presence or

**[\*48]** absence of fraudulent intent.  See <u>Cryer v. Commissioner</u>, T.C. Memo. 2013-69; <u>Fiore v. Commissioner</u>, T.C. Memo. 2013-21; <u>Cooley v. Commissioner</u>, T.C. Memo. 2004-49; <u>McGee v. Commissioner</u>, T.C. Memo. 2000-308; <u>Beretta v. Commissioner</u>, T.C. Memo. 1997-570; <u>Scallen v. Commissioner</u>, T.C. Memo. 1987-412, <u>aff'd</u>, 877 F.2d 1364 (8th Cir. 1989).

We cannot ignore the fact that petitioner ran a law firm specializing in tax fraud defense.  <u>Cf.</u> <u>Hatling v. Commissioner</u>, T.C. Memo. 2012-293.  While we do not infer fraudulent intent on the basis of petitioner's legal background alone, his experience necessarily informs our analysis of his behavior and intent.  <u>Accord</u> <u>Cole v. Commissioner</u>, 637 F.3d 767 (7th Cir. 2011), <u>aff'g</u> T.C. Memo. 2010-31; <u>Rowell v. Commissioner</u>, 884 F.2d 1085, 1088 (8th Cir. 1989), <u>aff'g</u> T.C. Memo. 1988-410.  With this background in mind, we consider the presence or absence of the badges of fraud.

### 2. Consistent Understatement of Income

Consistent understatement of income is "strong evidence of fraud." <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1568 (11th Cir. 1986) (quoting <u>Merritt v. Commissioner</u>, 301 F.2d 484, 487 (5th Cir. 1962), <u>aff'g</u> T.C. Memo. 1959-172), <u>aff'g</u> T.C. Memo. 1985-63.  A taxpayer who substantially and consistently understates his income provides "evidence of fraudulent intent to evade taxes"

[*49] even where the record is "devoid of the usual indicia of fraud". <u>Otsuki v. Commissioner</u>, 53 T.C. 96, 107-108 (1969).

Petitioner repeatedly understated his income over the course of several years. To start, in the course of this case petitioner conceded that for tax year 2008 he had claimed $831,154 in improper deductions and failed to report $140,000 in legal fees as income. Petitioner further conceded that the resulting understatement of income for 2008 was fraudulent. For tax year 2006 petitioner stipulated that he erroneously reported $813,000 in legal fees as liabilities instead of as income. For tax year 2005 petitioner filed a Form 1040 reporting only $33,203 in net profits from his law practice. Yet when he opened the UBS account, petitioner represented to UBS that his law practice earned him $75,212 of net profits in tax year 2005. Taken together, and in the light of petitioner's background and experience, we find this pattern particularly troubling and indicative of fraudulent intent.

### 3. Failure To Maintain Adequate Records

All taxpayers are required to maintain records sufficient to determine whether they are liable for tax, sec. 6001, and a failure to maintain adequate records can support a finding of fraudulent intent, <u>see</u> <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307-308 (9th Cir. 1986), <u>aff'g</u> T.C. Memo. 1984-601.

[*50] Both the Internal Revenue Code and the California Rules of Professional Conduct required petitioner to maintain adequate financial records. Ignoring his dual obligation, petitioner failed to maintain books and records sufficient to clearly distinguish funds reportable as income and funds held in trust.

Petitioner's inadequate recordkeeping was a chronic condition. He was subject to disciplinary proceedings before the State bar in California four separate times--all for offenses related to financial recordkeeping--the fourth of which resulted in disbarment. After his second and third disciplinary actions, the State bar required petitioner to satisfactorily complete an Ethics School Client Trust Account Record-Keeping Course and hire an outside consultant to overhaul his management and recordkeeping practices. Petitioner did not sufficiently update his practices, however. In its decision respecting petitioner's fourth and final disciplinary action, the State Bar Court of California--after an extensive review of petitioner's business practices--described petitioner's recordkeeping as still being "woefully inadequate," "lackadaisical", "grossly mismanaged", and rising to the level of "moral turpitude".

Our review of the record confirms these observations. Petitioner failed to maintain adequate records regarding his financial dealings. As it related to his law practice, petitioner maintained two sets of books. But in neither of these did he

[*51] account for the funds held in the UBS account. At all relevant times, petitioner asserted that he was entitled to 60% of the funds from the clergy lawsuit settlement held in the UBS account, but he failed to include the UBS account in either set of books. This is unreasonable and, considered in the light of petitioner's court-ordered courses and consultant engagements to improve his recordkeeping, points to a pattern of evasion. We find this badge indicates fraudulent intent.

### 4. Offering Implausible or Inconsistent Explanations

Implausible or inconsistent explanations for a taxpayer's behavior can indicate fraudulent intent. Id. at 307. Petitioner has offered several mystifying explanations. To start, petitioner's entire theory in this case is inconsistent with his position in earlier proceedings. As noted above, his position here is so inconsistent with his earlier positions that we felt compelled to estop his argument. This is a material inconsistency that strikes at the heart of petitioner's conduct regarding his Federal tax obligations.

Beyond this most serious inconsistency, petitioner has offered myriad other implausible and inconsistent explanations for his failure to include his fees as income in 2007. For example, when he filed his 2007 income tax return, petitioner claims, he relied on a purported tax opinion letter, but the document was actually a

[*52] memorandum prepared by a legal assistant at petitioner's request. While reliance on a tax opinion letter can be reasonable, the facts belie that notion. The memorandum's author had not passed the bar examination and had little experience in tax law. The memorandum is four pages long. It summarizes--at the highest level of generality--the doctrine of constructive receipt of income, but it provides little to no meaningful discussion of the particular facts of petitioner's case. Where the opinion does grapple with the facts, it does so on the basis of false and unreasonable assumptions provided by petitioner. It strains credulity to think that petitioner meaningfully relied upon this advice--given his own background in tax law--in taking his reporting position. This memorandum was a fig leaf covering petitioner's failure to report his legal fees for the year earned.

Moreover, petitioner repeatedly told the revenue agent during the examination that UBS had invested the clergy lawsuit settlement funds without his authorization. He did so notwithstanding that the Los Angeles County Superior Court had already held that claim to be "false" and "clearly erroneous". Petitioner maintained this claim, even though that court ruled that extensive evidence submitted in the FINRA expungement arbitration hearing "establish[ed] that the funds were invested at * * * [petitioner's] direction, following detailed conversations with him concerning the investments."

[*53] Given the flagrant inconsistency of petitioner's positions, we conclude that this badge supports a finding of fraudulent intent.

### 5. Concealment of Income or Assets

Concealing income or assets supports an inference of fraudulent intent. Spies v. United States, 317 U.S. 492, 499 (1943). As noted above, petitioner did not account for the UBS account in either of his law firm's general ledgers. He did not inform his return preparer about the UBS account, his fee arrangements, or any potential income derived from his legal services in the clergy lawsuit case. In the light of the total circumstances, we find that this badge supports an inference of fraudulent intent.

### 6. Failure To Cooperate With Authorities

Refusing to cooperate, or failing to fully cooperate, with authorities during an examination can support an inference of fraudulent intent. See Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). From the start of the examination, petitioner sought to obfuscate the facts regarding when he earned his fee in the clergy lawsuit. In response to an initial information document request, as noted above, petitioner repeated the lie that UBS had invested the funds without his permission. Similarly, petitioner has maintained before this Court that a fee dispute existed between him and his clients during 2007, even though the Los Angeles County

[*54] Superior Court found--on petitioner's evidence--that no such dispute existed. These two statements were unsupportable when made and reinforce a finding of petitioner's fraudulent intent.

### 7. Filing False Documents

Filing false documents with the Internal Revenue Service or with third parties supports an inference of fraudulent intent. As part of the FINRA arbitration, petitioner produced a purported copy of his 2009 income tax return that did not match what he actually filed with the IRS. The purported return produced in the course of the FINRA arbitration was, in a word, fraudulent. Moreover, petitioner has conceded that the income tax return he filed for tax year 2008 was knowingly false. In the light of petitioner's pattern of evasiveness and his sophistication, this badge indicates fraudulent intent.

### 8. False Testimony

Providing false, evasive, or otherwise inconsistent testimony supports an inference of fraudulent intent. See Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), aff'g Norman v. Commissioner, T.C. Memo. 1987-265. Petitioner consistently provided demonstrably false testimony before this Court. For instance, he testified that to secure the clergy lawsuit settlement he "actually had a trial." The record demonstrates, however, that the clergy lawsuit case settled as

[*55] part of the Archdiocese of Los Angeles' global settlement and that the settlement petitioner secured for his clients was allocated during an informal conference. As a litigator with decades of experience, petitioner can surely distinguish between a trial and a settlement conference. Petitioner also falsely testified as to his central theory of this case--that a fee dispute existed between himself and the Brothers. See supra pp. 34-38, 51-52. These are but two examples of many where petitioner provided false and evasive testimony; each points to fraudulent intent.

In short, all relevant badges of fraud support an inference of fraudulent intent, so we draw that inference.

III.    Conclusion

We conclude that petitioner has failed to carry his burden to prove the determination reflected in the notice of deficiency is incorrect and that respondent has carried his burden regarding those increased deficiencies asserted as new matters in his answer. We further conclude that respondent has proven, by clear and convincing evidence, that petitioner underpaid his income tax and did so with fraudulent intent. Moreover, petitioner has introduced no evidence that would support a finding that any portion of the underpayment is not attributable to fraud.

**[\*56]** Therefore, we conclude that the entire underpayment is attributable to fraud within the meaning of section 6663.

In reaching our decision, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.